53 CCPA

### Application of William R. BURGESS.
### Patent Appeal No. 7543.

United States Court of Customs and Patent Appeals.

April 21, 1966.

Harvey B. Jacobson, Washington, D. C., Harvey B. Jacobson, Jr., for appellant.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

William R. Burgess appeals from the decision of the Board of Appeals affirming the rejection of claims 2–10 in his application serial No. 791,138 filed February 4, 1959, entitled "Method for Preparing Mineral-Free Water." One claim has been allowed.

Broadly, appellant's invention relates to a method for regenerating mixtures of anion and cation exchange materials employed, inter alia, for removing the minerals in water thereby "softening" the water.

An understanding of the invention is facilitated by reading representative claim 2 in conjunction with Fig. 1 (reproduced below) of appellant's specification:

2. A method of regeneration of service demineralizers employing the mixed-bed principle of water demineralization and each including a service unit filled with a mixed bed of exhausted anion and cation exchange materials comprising the steps of removing the exhausted ion exchange materials from the unit [Upended tank 4 at upper center dumps its spent materials into lower separator 5.], completely separating the exhausted anion exchange material from the exhausted cation exchange material by hydraulic separation, by passing water upwardly through said exhausted anion exchange material [Tap water enters bottom of separator 5 at valve 7 and leaves at upper waste valve 8. The denser cation exchange material settles in the lower portion of the separator, while the light anion exchange material re-

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

mains on top.], transferring the anion exchange material to a vessel and the cation exchange material to another vessel [The separated anion exchange material is passed to the left from separator 5 through valves 10 and 14 to the anion regeneration column 9. The separated cation exchange material is passed to the right through valve 12 to the cation regeneration column 13.], passing a caustic solution through the anion exchange material regenerating it to the hydroxyl state [Tap water through valve 23 mixes with base chemical in tube 22 and passes thence through valve 24 into anion regeneration column 9.], rinsing the regenerated anion exchange material with demineralized water by passing the demineralized water downflow in the first mentioned vessel [Rinse water from alternate softeners 29 or 30 passes through upper valve 31, down through column 9, and out to drain through lower valve 33.] simultaneously [with passing a caustic solution as set forth above] passing an acid solution through the cation exchange material regenerating it to the hydrogen state [Acid from reservoir 26 passes through valve 27 into the cation regeneration column 13.], rinsing the regenerated cation exchange material with demineralized water by passing the demineralized water downflow through the second mentioned vessel [Rinse water from alternate softeners 29 or 30 passes through upper valve 32, down through column 13, and out to drain through lower valve 34.], hydraulically mixing the regenerated rinsed ion exchange materials [The rinsed beds are fluffed from below by momentarily cracking valves 25 and 28, the downflow rinses having packed the materials. Then the materials are passed through valves 38 and 39 into filler tube 37 at the right, where they intermix upon entry.], and transferring the hydraulically mixed regenerated rinsed ion exchange materials to a service unit [Valve 40 is opened to allow gravity flow of mixed materials into an empty service unit 4.].

Fig. I

Claim 3 differs from claim 2 in that the last-mentioned service unit is mechanically vibrated while the regenerated materials are flowing into such service unit. Claim 4 differs from claim 2 only in the recitation of multiple regeneration of service demineralizers. Claim 5 adds the limitation that the deionized rinse water comes from plural sources. Claim 6 differs from claim 2 only in the recitation of an interface maintained between the anion and cation exchange resins and withdrawing anion and cation exchange materials from both sides of the interface. Claim 7 differs from claim 6 in that it is stated the interface is left as a residual in the separator. Claim 8 has the added limitation of detecting the absence of chemical in the rinse water to provide a signal on which to act in discontinuing the rinse.

The issue is whether or not the claimed subject matter is obvious under 35 U.S.C. § 103 in view of the following prior art:

Fitch                     2,767,140     October 16, 1956
Kunin et al. (Kunin)      2,692,244     October 19, 1954

Kunin (see Fig. 1 of Kunin reproduced below) discloses a method of regenerating an exhausted bed of mixed ion exchange materials in a fixed water softener tank 1. The exhausted bed is hydraulically stratified into an upper layer 2 of cation exchange material, by backwashing at a fairly rapid rate through pipe 9. Next, a caustic solution is passed through pipe 10 down through both layers, or only through anion resin layer 3, after which it is withdrawn through unshown openings provided in the tank at the interface 6. This is followed by rinsing of the beds with deionized water. An acid is introduced through tube 11 and passes down through the layer of cation exchange resin 2 only. "Alternatively, the acid-regenerant can be admitted from the bottom of the container and its level controlled so that it does not rise above the top of the layer of cation-exchanger." Then deionized water is passed down through both beds in order to rinse out the acid regenerant. The regenerated materials are subsequently remixed by passing air through line 7 into the tank.

In preparing the anion-exchange resin, Kunin describes a treatment with sulfuric acid, a washing, and a conversion to a hydroxide form by stirring with an aqueous solution of sodium hydroxide. This is followed by a statement that "The final produce was washed with water until the washwater no longer gave a pink color with phenolphthalein." The test water from the Delaware River employed in one example was found to have a "pH of 6.5–7.0 and a resistivity of over one million ohms/cm., as determined by means of a conventional conductivity (Wheatstone) bridge," as it emerged from the operational water softener. Kunin considered the foregoing process an improvement over that of prior application serial No. 28,724, wherein one of the stratified ion exchangers was removed to a second container and separately regenerated there.

Kunin

Fitch (see Fig. 1 of Fitch reproduced below) discloses continuous ion exchange

treatment of water, attended by continuous removal of spent ion exchange resins from his operational bed, regeneration thereof, and return to said bed. With reference to Fig. 1, the water being treated enters separator B at W (bottom, left), passes up through the separator (where it hydraulically stratifies the spent anion exchange material into layer $Z_2$, and the spent cation exchange material into lower layer $Z_1$), passes down through conduit F to treatment tank A where it is deionized by an active mixed bed K, and finally leaves at T. Exhausted ion exchange materials are removed from tank A at lower spout 13 and transferred to separator B through conduit 59, where they enter at the interface between the continuously stratified cation and anion exchange materials. The former is drawn off through line 61 and passed to the top of cation regeneration column C. The latter is similarly drawn off at line 71 and passed to the top of anion regeneration column D. Acid and caustic solution are supplied to zones $Z_6$ of the respective columns, from tanks $S_1$ and $S_2$. Regeneration occurs in upper zones $Z_4$, in counterflow to the descending exchange materials. Rinse water is injected at lower points 49 and 49a, passing upwardly through lower zones $Z_5$ and serving as make-up water for the acid and caustic solution. Regenerated and rinsed materials leave the columns at lower spouts 44 and 44a, whence they are transferred to a mixing chamber 20 on top of the treating tank A.

Fig. I.

In his brief, appellant discusses claims 2, 3, 6 and 8 in one group, claims 4 and 5 in another group, and claims 7, 9 and 10 in still another. We will do the same.

*Claims 2, 3, 6, and 8*

Appellant points out that whereas the claims under discussion (as well as the remaining appealed claims) call for *down-*

*flow* rinsing of the regenerated ion exchange material, Fitch discloses an *upflow* rinsing step. To this same contention, the examiner answered:

> The added limitation that the regenerated anion and cation exchange resins be washed downflow by demineralized water is not deemed to be significant in view of the teachings in Kunin et al. who show the use of demineralized water to rinse out acid regenerate passed downflow through segregated beds. It would be obvious for one skilled in this art to rinse downflow with deionized water in the process and apparatus of Fitch by merely changing the wash pipe arrangement from the bottom of tanks C and D; i. e., move points to rinse $R_1$ and $R_2$ to the top of said tanks.

In rebuttal, appellant points out that such a modification would destroy the necessary delicate fluid flow balance required for operation of the Fitch process.

While we agree with the examiner that this difference between Fitch and appellant's process (upflow rinsing vs. downflow rinsing) is taught by Kunin and that this difference is not such as to render the appealed claims patentable, we do not deem it necessary to this conclusion that Fitch's process must be capable of physical modification to accommodate the downflow rinsing of Kunin. In re Lee, 193 F.2d 186, 39 CCPA 752. Fitch discloses upflow rinsing of regenerated ion exchange material, and Kunin downflow rinsing of like material. Considering both appellant's invention and the prior art in their entireties, we believe the downflow rinsing called for in the appealed claims to be taught by the prior art. Kunin, Fitch and appellant are all concerned with regenerating ion exchange material. Both upflow and downflow rinsing are disclosed by the prior art. We see no reason why one desiring to rinse the regenerated material would not be taught by Kunin to employ downflow rinsing.

█ Claim 3 recites a further step which according to appellant is not disclosed by the prior art, that being the step of vibrating the previously emptied service units while they are being refilled with the mixed regenerated ion exchange materials. The examiner considered this step "utterly so notoriously old and conventional in the art that it [is] unnecessary to cite a reference to show the step." Appellant traversed the examiner's contention. We agree with the examiner. We take judicial notice of the fact that in filling a container, it is conventional to vibrate the container to facilitate the packing thereof.

Next, claim 8 includes a limitation directed to detecting the absence of chemical in the rinse water from the regenerated ion exchange material in order to provide a signal for discontinuing the rinse. Kunin, on the other hand, teaches testing the water which has been treated with the ion exchange materials to determine the success of the deionization. Also, in discussing a method for preparing their anion-exchange resins, Kunin mentions that the resin is converted to the form of the quaternary ammonium hydroxide by being stirred with an aqueous solution of sodium hydroxide. The quaternary salt "was then washed with water until the washwater no longer gave a pink color with phenolphthalein." We consider the foregoing teachings from Kunin to be exemplary of the technique of testing effluents for the presence of residual chemicals in the ion-exchange art and while appellant performs his analysis at a different stage than Kunin, we believe this difference to be obvious in view of Kunin.

### Claims 4 and 5

The principal contention for patentability of these claims is that they are directed to multiple regeneration of service demineralizers *at one time*, whereas the prior art teaches single unit regeneration. While it is true that the prior art does not specifically teach multiple regeneration, we are not persuaded that there is anything nonobvious about such a difference. Appellant's arguments appear directed solely to the novelty of such difference.

### Claims 7, 9, and 10

Each of these three claims defines the hydraulic separation of the ion exchange material as establishing "an anion and cation interface" from opposite sides of which the cation and anion materials are withdrawn and the interface is left as a residual in the separator vessel. So far as the hydraulic separation of ion exchange material is concerned, this technique is specifically disclosed by Kunin, who states:

> After the mixed bed has absorbed its full capacity of ions, the bed is taken out of service and is regenerated. The first step in regenerating the mixture of ion-exchangers is to resolve it into its components. This is done by hydraulic classification or stratification, during which water is passed upflow from pipe 9 at a fairly rapid rate through the tank. * * *

As for the residual interface, again appellant has argued the novelty of this limitation without so much as a hint as to why it would be nonobvious. Our reading of the prior art leads us to the conclusion that the state of the art is fairly well developed. Appellant appears to have employed certain novel techniques in regenerating ion-exchange materials but has not given us any substantial reasons why the novel aspects of his invention are nonobvious. On the surface, these novel aspects appear rather minor, and considering the closeness of the prior art, we are not convinced of reversible error in the board's decision that the subject matter of claims 2–10, *taken as a whole,* is obvious under 35 U.S.C. § 103.

The board's decision is affirmed.

Affirmed.

SMITH, Judge, concurs in the result.